IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: PREMISES LOCATED AT 70 MOLLY's POINT ROAD, SOUTHPORT, MAINE 04576 | Case No. 2:24-mj-130-KFW **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, David C. Fife, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 70 Molly's Point Road, Southport, Maine, 04576, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B. Susan Katzev resides at the PREMISES. This application seeks authority for a warrant to search for and seize evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Section 542 (entry of goods by false statements); 18 U.S.C. § 545 (smuggling of goods into the U.S.); 18 U.S.C. § 371 (conspiracy); and specific violations of the International Emergency Economic Powers Act ("IEEPA") (codified at Title 50, United States Code) and regulations issued pursuant to IEEPA.

2.      I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been since August 2009. I am currently assigned to HSI's Portland, Maine office. I have participated in numerous criminal investigations, to include matters involving the general smuggling of contraband into the United States, as well as investigations involving the trafficking of illicit cultural property into the United States.

In my career I have utilized various investigative tools and techniques to include the use of search warrants.

3.      This affidavit is intended to provide only the facts necessary for a determination of probable cause for the requested search warrant and does not set forth all of my knowledge or the knowledge of others about this matter. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers and experts, my review of documents and computer records related to this investigation, and information gained through my training and experience.

## THE APPLICABLE LAW AND REGULATIONS

### I.    Entry of goods by means of false statements

4.      Title 18, United States Code, Section 542 provides criminal fines and penalties for any person who:

   a.  [E]nters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or more makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall be deprived of any lawful duties; or

     b.  [I]s guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in any such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission.

5.     Shipments of goods arriving at the ports of the United States must be granted "entry," or clearance, by the Department of Homeland Security, Customs and Border Protection ("Customs" or "CBP") prior to the goods being allowed to enter the commerce of the United States. The importer of a shipment of goods may obtain such clearance through the use of a "Customs Broker," an individual or company licensed by Customs to file entry documents for commercial shipments. The importer (or agent of the importer) presents the Customs Broker with certain documents describing the shipment. The Customs Broker generates an entry package from these documents and provides them to Customs in order to obtain clearance for the goods to enter the United States.

6.     Statutes and regulations governing the importation process, including but not limited to Title 18, United States Code, Sections 541 and 542, and Title 19, United States Code, Section 1592, require persons bringing merchandise into the United States to provide truthful and complete statements to Customs about the merchandise.

7.     Some merchandise can also enter the United States via an "informal entry." Informal entries are permitted for goods meeting certain criteria, including a value of $2,000 or less. No Customs Broker or entry form are required for an informal entry. The importer must, however, accurately list the contents of the package, country of origin, and the value of the contents on a shipping label.

8.     Depending on the commodity being shipped, a shipper outside the United States will generally file a customs declaration and/or import paperwork along with the shipment, during which a declaration is made regarding the contents, value, etc., of the item(s) being shipped. In many cases, this filing is accomplished by the express consignment shipping entity (FedEx, UPS, a national postal service, etc.) based upon the information entered by the shipper. This information is filed electronically with CBP as part of the normal import process for most express consignment parcels.

## II.     Smuggling goods into the United States

9.     Title 18, United States Code, Section 545 provides criminal fines and penalties for any person who:

> a.   [K]nowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or
>
> b.   [F]raudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

10.     Upon information and belief, persons who smuggle or conspire to smuggle stolen cultural property into the United States typically avoid detection by Customs by

means of false statements regarding the contents, value, and country or countries of origin of their shipments. In particular, they avoid listing countries of origin like Egypt or Iraq, whose patrimony laws restrict the ownership and exportation of cultural property. Importation of cultural property into the United States in violation of a foreign country's patrimony law may violate the National Stolen Property Act, codified at Title 18, United States Code, Sections 2314-2315, *et seq*. Further, falsely identifying the country of origin on Customs entry documents constitutes a material false statement under Title 18, United States Code, Section 542.

### III.   National Stolen Property Act (18 U.S.C. §§ 2314-2315)

11.   Title 18, United States Code, Section 2314 provides, in pertinent part: "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, [or] merchandise . . . of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud" violates the law.

12.   Title 18, United States Code, Section 2315 provides, in pertinent part: "Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise . . . of the value of $5,000 or more . . . which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . ." violates the law.

13.   Cultural property is considered "stolen" under Title 18, United States Code, Sections 2314 and 2315, if it was taken without official authorization from a foreign country whose laws establish state ownership of such cultural property.

### IV.   Legal Protections for Iraqi Cultural Property

14.   <u>U.S. Prohibitions on Importation.</u> The importation of Iraqi cultural property into the United States has been restricted since 1990, when the United States

implemented a general ban on the importation of any Iraqi goods via the Iraqi Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 575. In 2004, Title 31, Code of Federal Regulations, Section 575.533 was amended to lift the general ban while retaining more limited restrictions, including a ban on the importation of "Iraqi cultural property or other items of archaeological, historical, cultural, rare scientific, and religious importance illegally removed from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." Pursuant to section 575.533(b)(5), "[a]ny trade in or transfer of such items, including items with respect to which reasonable suspicion exists that they have been illegally removed" remained prohibited.

15.     In 2010, the Iraqi Sanctions Regulations were repealed and replaced with the Iraq Stabilization and Insurgency Sanctions Regulations, codified at Title 31, Code of Federal Regulations, Part 576. In particular, "[u]nless licensed or otherwise authorized pursuant to this part or otherwise consistent with U.S. Law," Section 576.208 prohibits "the trade in or transfer of ownership or possession of Iraqi cultural property or other items of archeological, historical, cultural, rare scientific, and religious importance that were illegally removed, or for which a reasonable suspicion exists that they were illegally removed, from the Iraq National Museum, the National Library, and other locations in Iraq since August 6, 1990." The regulation incorporates the criminal and civil penalties set forth in the International Emergency Economic Powers Act ("IEEPA") (codified at Title 50, United States Code, Section 1705). *See* 31 C.F.R. § 576.701.

16.     On April 30, 2008, U.S. Customs and Border Protection ("CBP") amended C.F.R. Part 12 to reflect the imposition of import restrictions on Iraqi archeological and ethnological materials.  19 C.F.R. § 12.104j.

17.     <u>Iraqi Patrimony Law.</u> Under Article 3 of Iraq's Antiquities Law No. 59 of 1936 (as amended in 1974 and 1975), all antiquities found in Iraq, whether movable or immovable, on or under the ground, are considered property of the state. Under Article 16 of Antiquities Law No. 59, private persons generally cannot possess antiquities. Where private possession is authorized, the antiquities must be registered with the government and may only be transferred to another Iraqi party with government approval. Article 26 of Antiquities Law No. 59 prohibits the export of Iraqi antiquities. The law's definition of "antiquities" includes movable possessions which were made, produced, sculpted, written or drawn by man and which are at least 200 years old. In 2002, Iraq issued the Antiquities and Heritage Law, Law No. 55 of 2002, which contains similar provisions.

## V.     Prohibitions on imports from Iran

18.     On about August 19, 1997, the President of the United States issued Executive Order 13059, which clarified that virtually all trade and investment with Iran is prohibited. The IEEPA and the Iranian Transaction and Sanctions Regulations ("ITR") promulgated thereunder, principally 31 C.F.R. § 560.201, prohibit the importation of goods or services of Iranian origin from Iran except as specifically authorized pursuant to federal regulation.

19.     Specifically, 31 C.F.R. § 560.201 states, "Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the importation into the United States of any goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information and informational materials within the meaning of section 203(b)(3) of the International Emergency Economic Powers Act . . . is prohibited." The regulation

incorporates the criminal and civil penalties set forth in the International Emergency Economic Powers Act ("IEEPA") (codified at Title 50, United States Code, Section 1705). *See* 31 C.F.R. § 560.701.

20.     The willful violation of a regulation promulgated pursuant to the IEEPA is punishable by a fine and imprisonment.  *See* 50 U.S.C. § 1705(c).

21.     A person who first obtains a license from the Treasury Department's Office of Foreign Assets Control ("OFAC") can remove the import restrictions established by the IEEPA and the Code of Federal Regulations. *See, e.g.,* 31 C.F.R. §§ 501.801 and 576.501. OFAC has previously verified to HSI that Katzev had not applied for or obtained any license from OFAC to import Iraqi cultural property or goods of Iranian origin for the period that the items enumerated below were imported.

**SPECIFIC PROBABLE CAUSE**

**July 26, 2023 Search Warrant at 70 Molly's Point Road, Southport, ME**

22.     On July 25, 2023, I sought a federal search warrant for the residence of Susan Katzev located in Southport, ME (the PREMISES). My affidavit, filed in the District of Maine under case number 2:23-mj-209-KFW, detailed an investigation I was conducting into the smuggling of prohibited cultural property items into the United States from the United Kingdom and elsewhere. A copy of this affidavit is attached as Exhibit 1 and incorporated by reference herein. United States Magistrate Judge Karen Frink Wolf issued the requested search warrant on the same date.

23.     On July 26, 2023, I executed the search warrant at the PREMISES, which was established to be the residence of Susan Katzev, who lived there alone. I encountered Katzev at the PREMISES during the execution of the warrant, and spoke with her about the nature of the warrant and the fact that it involved the smuggling of

cultural property into the U.S. After my team conducted an initial sweep of the residence. Upon further explanation of the search warrant, Katzev stated that she indeed possessed a large quantity of antiquities in the house and had purchased them over a number of years, volunteering that she had purchased many from a gallery called 'Artemission.' During her explanation, Katzev motioned to a large shelf/display area to the right of her front foyer, where I observed several shelves containing scores of antiquities of all types; Katzev stated that the documents pertaining to her antiquities would be found on a particular shelf under this display area.

24.     Upon closer inspection of the antiquities on these shelves, I noted many that very closely resembled items from the cultures/countries involved in the earlier seizures I had made from international parcels destined for the PREMISES, referenced in Exhibit 1. Additionally, in the main entryway, I noted a large stone bust that appeared to be from Palmyra, in Syria (Katzev later confirmed this to be the case), as well as numerous Egyptian pieces, mosaics, large bowls, large Greek and Roman-style heads, and myriad other items from a variety of ancient cultures. Throughout the rest of the house, my team and I found a significant quantity of similar items spread among various other rooms, to include specifically Katzev's bedroom and study, a small study/sitting area to the left of the foyer on the ground floor, and what appeared to be a sitting room. My team also searched several rooms that contained contemporary/modern art and/or folk art; these rooms were searched in a cursory manner but were not found to contain any ancient art or documents pertaining to the same.

25.     Prior to execution of the search warrant, I had arranged for two experts from the Smithsonian Institution and Rutgers University to be on stand-by via video conference (FaceTime or WhatsApp) in order to help my team determine whether items

within the collection in Katzev's house appeared to be of similar origin/provenance as those I had seized in transit to the PREMISES. Once on scene, I attempted to virtually walk the experts through the entirety of Katzev's ancient art collection without disturbing it or handling it excessively, though due to the size of the collection it was not possible to examine any particular item in great detail. However, during the walk-through, the experts identified numerous items that appeared likely to originate from Iran, Iraq, and other countries covered by treaties/agreements stipulating import prohibitions to the United States.[1] Agents took photographs of numerous items located in the residence for further examination.

26.    As the search progressed, I conducted a brief interview with Katzev to explain more about the warrant and what the team would be seizing. I explained to her that agents were there because of a belief that there may be numerous items she had imported that were covered by agreements and/or laws preventing their import into the United States, and that it was important for the cultural heritage of these nations and the United States that the items be located and, if appropriate, returned to these nations. At one point, Katzev responded in exasperation that, "everything is looted, it's all looted," referencing the generalized argument that much of the cultural property found throughout the world was at one point taken from the original culture by nameless invaders, occupiers, or smugglers.[2] I further explained that agents were

---

1. Though the experts identified many potentially prohibited items during the virtual walk-through based upon a cursory video examination of these items, an actual determination of whether any of these specific items was prohibited from import to the United States can only be made after closer examination of the items and a review of any paperwork showing when the items were imported, from where, and, in the case of the Iraqi items, at what point they were stated to have been removed from their true country of origin (if the latter was in fact included on any provenance documentation).

2. During the search, the agents on my team encountered numerous books and newspaper articles throughout the house concerning the looting and pillaging of antiquities, particularly in the Middle East, indicating that Katzev was both aware of this problem and relatively current on the latest trends in the

alerted to the importation of possible illicit cultural property to her residence through a number of recent international mail seizures, though Katzev stated she could only recall one item that she had ordered that was seized. I explained that some of the items had been seized because they violated the agreements/emergency orders between the U.S. and other countries, while others had been seized because they were Iranian goods and were banned from import without a license. Through the course of the warrant execution, Katzev additionally told me that her entire art and antiquities collection is willed to a college upon her death, and that a professor/curator from that college frequently visits her house to catalogue her collection for the eventual transfer.

### Review of Seized Documents/Provenance Paperwork

27.     Upon conclusion of the search of the PREMISES on July 26, 2023, I seized several boxes containing provenance and other relevant paperwork related to Katzev's antiquities collection. I seized most of that paperwork from on or near the shelf indicated by Katzev. Over the next several months, I conducted a review of the documents and discovered provenance/invoice paperwork for more than one hundred antiquities that had been purchased from Artemission in the United Kingdom since the mid-2000s and imported into the United States. I also reviewed paperwork for scores of other pieces that had originated from various other galleries/dealers in the United Kingdom, as well as from American auction houses and dealers. Indeed, the totality of the documentation revealed that Katzev had amassed a significant collection over the course of several decades, with an apparent preference for items from ancient Greek and

---

trafficking of illicit cultural property through museums and collectors. Included among this literature was the book "Thieves of Baghdad" by Matthew Bogdanos, an assistant Manhattan district attorney responsible for numerous high-profile seizures of illicit cultural property from the Metropolitan Museum of Art in New York, and a printed article from The Art Newspaper about Bogdanos titled "Tough new scrutiny by district attorney rattles New York antiquities trade."

Roman cultures, as well as a variety of ancient cultures found within modern-day Iran, Iraq, Afghanistan, and Syria.

28.    In reviewing the paperwork regarding purchases from Artemission, I found that it was meticulously organized and contained news/scholarly articles or webpage printouts attached to the invoices of certain pieces, which indicated that Katzev had done additional research on that particular piece either before or after she had purchased it. Several of the Artemission documents also contained printouts of Katzev's correspondence with the gallery owners. In some instances, this correspondence showed that Katzev had requested additional provenance details on a particular piece, particularly when the piece arrived with little or no provenance information printed on the invoice. In response to her inquiries, the owners of Artemission often provided vague or redundant information or stated that they had no further information, though with certain pieces they provided seemingly implausible details, claiming that several pieces had been the property of a "prince" or other unnamed British aristocrats.

29.    Upon completion of my review of the invoices and provenance paperwork, I identified 63 pieces that were either specifically described in their invoices/accompanying paperwork as originating from cultures/geographic areas that exist entirely or almost exclusively within the confines of modern-day Iran or that appeared to originate from Iraq and, based upon the listed provenance—or lack of provenance and/or vague/inconsistent provenance descriptions—to have likely departed the country after the implementation of the legal protections for Iraqi cultural property. The items I identified, almost all of which were sold and exported by Artemission in London, United Kingdom, are described in their documentation as follows:

1) "Decorated Luristan[3] Bronze Stag, c. 900-800 B.C. Culture: Luristan."
   No provenance listed.
   Date of import to U.S.: on/around September 19, 2008 [Artemission, Exhibit 2].

2) "Luristan Bronze Sitting Horse, c. 900 B.C. Culture: Luristan."
   No provenance listed.
   Date of import to U.S.: on/around July 22, 2008 [Artemission, Exhibit 3].

3) "Luristan Bronze Lioness Figure, Persia,, c. 1000 B.C. Culture: Luristan."
   No provenance listed.
   Date of import to U.S.: on/around January 17, 2010 [Artemission, Exhibit 4].

4) "Luristan Bronze Horse Cheek-Piece in the Form of a Stag, c. 900 B.C. Culture: Luristan."
   No provenance listed.
   Date of import to U.S.: on/around January 6, 2010 [Artemission, Exhibit 5].

5) "Large Luristan Bronze Double Stag, c. 8th-6th Century B.C. Culture: Luristan."
   Provenance: "Previously in a private UK collection, acquired from Moore antiquities 2002, London, UK."
   Date of import to U.S.: on/around February 2, 2015 [Artemission, Exhibit 6].

6) "Luristan Bronze Rattle with Ibex, 8th-7th Century B.C. Culture: Luristan."
   Provenance: "The Leo Mildenberg Collection of Ancient Animals, Ex. Christie's Auction, London, Oct. 2007."
   Date of import to U.S.: on/around May 31, 2016 [Artemission, Exhibit 7].

7) "Luristan Bronze Bell with Rams' Head, c. 900 B.C. Culture: Luristan."
   Provenance: "UK private collection."
   Date of import to U.S.: on/around May 3, 2016 [Artemission, Exhibit 8].

8) "Luristan Bronze Harness Trapping, Mythical Animal, c. 900 B.C. Culture: Luristan."
   Provenance: "Private collection of a Lady, London, UK."
   Date of import to U.S.: on/around December 7, 2015 [Artemission, Exhibit 9].

---

3. Luristan (also Lorestan) refers to the ancient civilization of the Lurs people that existed almost entirely within the borders of modern-day Iran, in the current Iranian province of Lorestan. The region is particularly known for its bronze artifacts, which were produced as far back as the 3rd millennium B.C. through approximately 650 B.C.

9) "Large Luristan Standard with Ibexes and Leopards, c. 900-800 B.C. Culture: Luristan."
Provenance: "Property of a Princely collection, acquired in the ME[4] in the 1960's."
Date of import to U.S.: on/around May 29, 2015 [Artemission, Exhibit 10].

10) "Luristan Bronze and Stone Sword Sharpener, c. 900 B.C. Culture: Luristan, Persia[5]."
Provenance: "Princely collection, acquired in the 1960's-1970's."
Date of import to U.S.: on/around May 22, 2015 [Artemission, Exhibit 11].

11) "Large Luristan Bronze Winged Stag and Fawn, Horse Cheekpiece, Persia c. 900 B.C. Culture: Luristan."
Provenance: "British private collection, Mr. A. Ghazi, acquired in Holland in the 1980's."
Date of import to U.S.: on/around September 30, 2016 [Artemission, Exhibit 12].

12) "Luristan Bronze Mountain Goat Cosmetic Vessel, c. 1000-900 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around October 16, 2007 [Artemission, Exhibit 13].

13) "Luristan Bronze Cheekpiece in the Shape of a Horse, Persia c. 900 B.C. Culture: Luristan."
Provenance: "British private collection, acquired at TL auction London."
Date of import to U.S.: on/around November 22, 2021 [Artemission, Exhibit 14].

14) "Luristan Bronze Pendant-Mirror c. 1000 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around March 28, 2007 [Artemission, Exhibit 15].

15) "Luristan Bronze Bird c. 900 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around September 30, 2016 [Artemission, Exhibit 16].

---

4. "ME" is believed to reference the Middle East.

5. "Persia" is a very broad term that, while very frequently referencing modern-day Iran, can also encompass vast regions of the Middle East, reflected by the footprint once held by the Persian Empire (Achaemenid, Seleucid, Parthian, and Sassanian (Sasanian) Empires). In the context of the items sold by Artemission, it appears that the majority of items listed either in whole or in part as "Persian" likely did originate from civilizations and/or locations within modern-day Iran. Indeed many, such as this particular exhibit, also contain more specific item descriptions such as "Luristan" to further bolster the likelihood that they originated from within modern-day Iran.

16) "Large Luristan Bronze Stag, Persia c. 900 B.C. Culture: Luristan."
Provenance: "Ex private French collection, acquired in France in the 1970's."
Date of import to U.S.: on/around June 5, 2006 [Artemission, Exhibit 17].

17) "Luristan Bronze Cheekpiece in the Shape of a Horse, c. 900 B.C. Culture: Luristan."
Provenance: "British private collection, acquired at TL auction London"
Date of import to U.S.: on/around May 6, 2021 [Artemission, Exhibit 18].

18) "Luristan Iron Axe Head with Eagle Head, c. 9th-8th Century B.C. Culture: Luristan."
Provenance: "ex Property Mr. A. Dajan, London, acquired prior to 2000."
Date of import to U.S.: on/around May 16, 2018 [Artemission, Exhibit 19].

19) "Two Luristan Bronze Cheekpieces in the Shape of Horses, Persia c. 900 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around May 24, 2006 [Artemission, Exhibit 20].

20) "Luristan Bronze Standard Finial with Ibex and Lions, c. 1000 B.C. Culture: Luristan."
Provenance: "Property of the collection of a Prince, acquired in the 1960's."
Date of import to U.S.: on/around January 30, 2008 [Artemission, Exhibit 21].

21) "Luristan Bronze Finial with Figure and Bulls, c. 9th-8th Century B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around December 17, 2007 [Artemission, Exhibit 22].

22) "Luristan Bronze Master-of-Animals Standard, c. 8th-7th Century B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around May 2, 2008 [Artemission, Exhibit 23].

23) "Luristan Bronze facing Lions Finial, Persia, c. 1000 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around May 21, 2008 [Artemission, Exhibit 24].

24) "Luristan Bronze Military Bracelet with Horses Heads, c. 1000 B.C. Culture: Luristan."
No provenance listed.
Date of import to U.S.: on/around June 30, 2008 [Artemission, Exhibit 25].

25) "Luristan Bronze Horse Plaque, ex. Christies, c. 800 B.C. Culture: Luristan."
Provenance: "Published Christies London, October 2007, previously the property of a Prince, acquired in the 1960s."
Date of import to U.S.: on/around May 6, 2021 [Artemission, Exhibit 26].

26) "Achaemenide[6] Silver Head of a Sceptre [sic] with Rams Head, c. 600-500 B.C. Culture: Achaemenide."
No provenance listed.
Date of import to U.S.: on/around February 9, 2015 [Artemission, Exhibit 27].

27) "Achaemenid Bronze Bowl, c. 6th-5th Century B.C. Culture: Achaemenid."
No provenance listed.
Date of import to U.S.: on/around July 25, 2010 [Artemission, Exhibit 28].

28) "Large Achaemenid Bronze Bowl Decorated with a Lotus Buds, Persia, 5th Century B.C. Culture: Achaemenid."
Provenance: "Ex property Mr. M.P., London, UK, acquired from a London Gallery in 2001."
Date of import to U.S.: on/around January 30, 2008 [Artemission, Exhibit 29].

29) "Achaemenide Bronze Decorated Cup, c. 6th Century B.C. Culture: Achaemenide."
No provenance listed.
Date of import to U.S.: on/around August 6, 2007 [Artemission, Exhibit 30].

30) "Persian Silver Peacock, Seljuk[7] Period, c. 10th-11th Century A.D. Culture: Persia."
No provenance listed.
Date of import to U.S.: on/around August 1, 2011 [Artemission, Exhibit 31].

---

6. The Achaemenid (misspelled by Artemission in this case as "Achaemenide") Empire, also known as the First Persian Empire, was an ancient empire based in modern-day Iran that spanned from roughly 550 B.C. to approximately 330 B.C. At its height, the empire did span beyond the borders of modern-day Iran into the surrounding West Asian region and northern Egypt.

7. The Seljuk Empire was a medieval empire that spanned roughly 1037-1194 A.D. and encompassed nearly all of modern-day Iran as well as portions of Turkey, Iraq, Afghanistan, and Central Asia.

31)"Bronze Oil Lamp With Lions and Bird Handle, Seljuk, Persia 11th Century A.D. Culture: Seljuk, Persia."
No provenance listed.
Date of import to U.S.: on/around September 26, 2007 [Artemission, Exhibit 32].

32)"Green stone animal amulet, Iran, late 2nd or 1st Millenium B.C. Culture: Iran."
Provenance: "Ex. private collection, London, UK, acquired before 1990."
Date of import to U.S.: on/around March 20, 2012 [Helios Gallery London, Exhibit 33].

33)"Bactrian[8] Bronze Zebu Bull, Persia, c. 2200-2000 B.C. Culture: Bactrian."
No provenance listed.
Date of import to U.S.: on/around March 11, 2009 [Artemission, Exhibit 34].

34)"Terracotta Horse, Mauryan[9] Period, Persia, c. 5th-3rd Century B.C. Culture: Persia."
Provenance: "Published Bonhams, London, 30th October 2003, Lot 359. Ex. Private Dutch Collection. Accompanied by a thermoluminescence test certificate from Ralf Kotalla Laboratory, Haigerloch-Weildorf, Germany."
Date of import to U.S.: on/around May 17, 2012 [Artemission, Exhibit 35].

35)"Bactrian Grey/Green Stone Figure of a Mouflon, Persia, c. 1500 B.C. Culture: Persia."
Provenance: "ex. property Mr. S.Q., London UK."

---

8. 'Bactrian' broadly refers to an ancient region/civilization of central Asia encompassing modern-day Iran, Afghanistan, Tajikistan, and Uzbekistan, dating from approximately 2500 B.C. to 1000 A.D. In my training and experience, and based on conversations with other investigators and experts, I know that 'Bactrian' is commonly used as a very broad term in the antiquities world and can be used to muddle the true provenance of an item due to the large region it can encompass. Based upon previous CBP and HSI seizures of items described as "Bactrian" originating from Artemission, as well as a preliminary expert analysis of images of the items described as "Bactrian" within this list, it appears that many of the items sold by Artemission that were labelled as "Bactrian" are likely of Iranian origin, and several bear strong stylistic resemblances to items from the "Jiroft" site/ancient civilization found within modern-day Iran. Indeed, copies of emails between Katzev and Artemission regarding this particular piece (Exhibit 34) show that the owner of Artemission appeared to have acquired the item along with several other similar ones as one lot from a "local dealer" in London. Images provided to Katzev of the item upon acquisition and before it was cleaned by Artemission show that it had been very dirty and corroded, with some of the items in the lot seemingly still covered in dirt. This, coupled with the lack of any provenance for this particular piece, indicates that the items in the lot that contained Exhibit 34 may have been looted from a dig site and, at some point, smuggled into the United Kingdom.

9. The "Mauryan Period" in this instance appears to reference the Maurya Empire, which was a South Asian empire based mostly in modern-day India that existed from roughly 322-184 B.C. It is unclear why this piece is described as both Mauryan and Persian culture, though the Maurya Empire did appear to stretch to the far eastern fringes of the modern Pakistan-Iran border.

Date of import to U.S.: on/around March 13, 2011 [Artemission, Exhibit 36].

36) "Persian Painted & Glazed Brick, Head of a Man, Bukan[10,] c. 1000 B.C. Culture: Persia."
Provenance: "UK private collection of a gentleman of Iranian descent, acquired in the ME in the 1960's-1970s."
Date of import to U.S.: on/around January 8, 2016 [Artemission, Exhibit 37].

37) "Western Persia Vessel, Tepe Giyan,[11] Mid 2nd Millenium B.C. Culture: Western Persia."
Provenance: "Timeline auction March 2013 from a private UK collection."
Date of import to U.S.: on/around January 3, 2014 [Artemission, Exhibit 38].

38) "West Persia Vessel, Tepe Giyan, Mid 2nd Millenium B.C. Culture: Western Persia."
Provenance: "Timeline auction March 2013 from a private UK collection."
Date of import to U.S.: on/around January 3, 2014 [Artemission, Exhibit 39].

39) "Sassanian[12] Bronze Lion Attachment, c. 5th Century A.D. Culture: Sassanian."
No provenance listed.
Date of import to U.S.: on/around August 14, 2012 [Artemission, Exhibit 40].

40) "Sassanian Marble Horse's Head, c. 4th-5th Century A.D. Culture: Sassanian."
Provenance: "Ex. private Mr. H. Tavit collection, London UK, acquired in the 1970s from a Brussels gallery."
Date of import to U.S.: on/around July 24, 2016 [Artemission, Exhibit 41].

41) "Sassanian Gold Bracelet with Figures and Inscription, c. 5th-6th Century A.D. Culture: Sassanian."
No provenance listed.
Date of import to U.S.: on/around June 7, 2007 [Artemission, Exhibit 42].

---

10. Bukan is a city located in the West Azerbaijan Province of modern-day Iran. It is the site of some Iron Age archaeological sites, which is likely why the town is referenced in the description provided by Artemission.

11. Tepe Giyan is an archaeological site located in the Lorestan (Luristan) Province of modern-day Iran.

12. The Sassanian (Sasanian) Empire, also known as the Second Persian Empire, was an ancient empire based in modern-day Iran that spanned from roughly 224 A.D. to approximately 651 A.D. At its height, the empire did span beyond the borders of modern-day Iran into the surrounding West Asian, northern Egyptian, and Roman territories.

42) "Sassanian Marble Relief of a Seated Stag, c. 2nd-3rd Century A.D. Culture: Sassanian."
No provenance listed.
Date of import to U.S.: on/around March 15, 2007 [Artemission, Exhibit 43].

43) "Nishapur[13] Glazed Pottery Bowl, Persia 11th Century A.D. Culture: Nishapur."
Provenance: "ex. property Mr. A. Dajan, London, acquired in the 1980s-1990s."
Date of import to U.S.: on/around February 22, 2019 [Artemission, Exhibit 44].

44) "Elamite[14] Bronze Cosmetic Vessel with Three Ram's Head, c. 2500-2200 B.C. Culture: Elamite."
Provenance: "From a Japanese collection of the 1980s, acquired at a London auction."
Date of import to U.S.: on/around July 10, 2020 [Artemission, Exhibit 45].

45) "Elamite Black Steatite Stag Vessel, c. 2200-2000 B.C. Culture: Elamite."
Provenance: "UK private collection of a gentleman of Iranian descent, acquired in the 1960's-1970s."
Date of import to U.S.: on/around November 8, 2019 [Artemission, Exhibit 46].

46) "Elamite Bronze Axe Head with Dragon's Head, c. 1000 B.C. Culture: Elamite."
Provenance: "ex. UK collection, acquired prior to 2010."
Date of import to U.S.: on/around February 28, 2022 [Artemission, Exhibit 47].

47) "Rare Elamite Copper-Alloy Figure of a Horned Quadrupede [sic], c. 2400-2200 B.C. Culture: Sumerian."
No provenance listed.
Date of import to U.S.: on/around December 23, 2008 [Artemission, Exhibit 48].

---

13. Nishapur is an ancient city located in Nishapur County, Razavi Khorasan Province, Iran.

14. Elamite appears to refer to the Elamite Empire, which existed along the northeastern shores of the Persian Gulf, almost entirely within the borders of modern-day Iran, and spanned approximately 3200-529 B.C.

48) "Amlash[15] Bronze Figure, c. Late 2nd Millenium B.C./Early First Millenium B.C. Culture: Amlash."
Provenance: "ex. property A. Sultani, London UK, acquired on the London art market in 2001."
Date of import to U.S.: on/around October 12, 2015 [Artemission, Exhibit 49].

49) "Amlash Bronze Figure Grinding Grains, North Persia, c. 1000 B.C. Culture: Amlash."
Provenance: "Collection Mr. A.R., London UK, acquired in 2002 on the London Art Market."
Date of import to U.S.: on/around November 27, 2015 [Artemission, Exhibit 50].

50) "Rare Parthian[16] Bronze Ewer with Griffin, c. 1st-2nd Century A.D. Culture: Parthian."
Provenance: "UK collection, acquired in the 1980s on the London art market."
Date of import to U.S.: on/around May 21, 2012 [Artemission, Exhibit 51].

51) "Bactrian Chlorite Plaque Pendant with Eagle, c. 2200 B.C. Culture: Bactrian."
No provenance listed.
Date of import to U.S.: on/around March 10, 2008 [Artemission, Exhibit 52].

52) "Bactrian Chlorite Processional Votive Eagle, c. 2200 B.C. Culture: Bactrian."
No provenance listed.
Date of import to U.S.: on/around March 31, 2008 [Artemission, Exhibit 53].

53) "Decorated Bactrian Chlorite Chalice, c. 2200 B.C. Culture: Bactrian."
No provenance listed.
Date of import to U.S.: on/around December 2007 [Artemission, Exhibit 54].

54) "Western Asiatic Bactrian Jar with Figural Scene, Third Millenium B.C. Culture: Western Asiatic."

---

15. Amlash appears to refer to the "Amlash culture," which is an archeological construct that encompasses a combination of ancient cultures located in/near modern-day Amlash, Amlash County, Gilan Province, Iran.

16. Parthian appears to refer to the Parthian Empire, an ancient empire based in modern-day Iran that spanned from roughly 247 B.C. to approximately 224 A.D. As with the First and Second Persian Empires, this empire did also span beyond the borders of modern-day Iran into the surrounding West Asian region and Iraq/Turkey.

Provenance: "From an important private London collection; formed in the 1970s and 1980s."
Date of import to U.S.: on/around February 28, 2017 [Timeline Auctions London, Exhibit 55].

55) "Large Bactrian Plaque, Bull Man and Dragons, c. 2200 B.C. Culture: Bactrian."
Provenance: "ex. property Mr. A. Dajan, London, UK, acquired in the 1990s."
Date of import to U.S.: on/around May 1, 2018 [Artemission, Exhibit 56].

56) "Bactrian Chlorite Ram's Head, Mid 1st Millenium B.C. Culture: Bactrian."
Provenance: "ex. Mr. Dajan collection, acquired on the London art market in 2001.
Date of import to U.S.: on/around June 23, 2016 [Artemission, Exhibit 57].

57) "Bactrian Bronze Cosmetic Bottle with Rams, c. Early 1st Millenium B.C. Culture: Early 1st Millenium B.C. [sic]."
Provenance: "ex. collection Mr. A. Sultani, London, UK."
Date of import to U.S.: on/around January 31, 2013 [Artemission, Exhibit 58].

58) "Bactrian White Steatite Head of a Man, 3rd Millenium B.C. Culture: Bactrian, Persia."
No provenance listed.
Date of import to U.S.: on/around August 18, 2009 [Artemission, Exhibit 59].

59) "Large Sumerian[17] Steatite Bull Amulet Seal, c. 2800-2500 B.C. Culture: Sumerian."
Provenance: "ex. Dr. I Beekmans collection, Germny, acquired in the 1990s."
Date of import to U.S.: on/around June 30, 2016 [Artemission, Exhibit 60].

60) "Sumerian Uruk/Jemdet Nasr[18]  Marble Amulet of a Boar, c. 3200-2900 B.C. Culture: Sumerian."
Provenance: "British collection, Edinburgh, Scotland."

---

17. Sumer (Sumerian) appears to reference an ancient civilization in the historical area of southern Mesopotamia, corresponding roughly to modern-day south and central Iraq. The civilization emerged between the 6th and 5th millennium BCE and spanned through approximately 1900 BCE.

18. "Uruk-Jemdet Nasr" appears to conflate and reference two different ancient civilizations/archaeological sites within modern-day Iraq, Jemdet-Nasr and Uruk, dating in total from around 4000 B.C. to 2900 B.C.

Date of import to U.S.: on/around August 4, 2014 [Artemission, Exhibit 61].

61) "Uruk Jemdet Nasr Marble Bull Amulet, Syria, c. 3200-2900 B.C. Culture: Uruk Jemdet Nasr."
Provenance: "ex Collection Mr. S. Dajan, 1980s-1990s."
Date of import to U.S.: on/around September 26, 2014 [Artemission, Exhibit 62].

62) "Sumerian Terracotta Dedication Foundation Cone with Cuneiform Inscription c. 2000 B.C. Culture: Sumerian."
Provenance: "European private collection, acquired prior to 2000."
Date of import to U.S.: on/around October 6, 2020 [Artemission, Exhibit 63].

63) "Uruk-Jemdet Nasr Amulet of a Bull, c. 3000 B.C. Culture: Uruk-Jemdet Nasr."
No provenance listed.
Date of import to U.S.: on/around October 1, 2009 [Artemission, Exhibit 64].

30.    In mid-December 2023, I contacted one of the experts who had assisted me via video conference while at the PREMISES during the search on July 26, 2023, and I sent her images of the items described in Paragraphs 29(26) through 29(31), 29(33) through 29(35), 29(39) through 29(42), 29(44) through 29(47), and 29(50) through 29(63). Most were images from the provenance paperwork seized from the PREMISES, though some were images taken by agents during the execution of the search warrant. I had selected these particular items due to the fact that the descriptions provided on the invoices/paperwork were vague enough that the items could in fact originate from regions outside of modern-day Iran or Iraq. The remaining items contained descriptions that clearly described a location or archaeological site within modern-day Iran or Iraq. Over the course of several days, the expert reviewed the images and accompanying documents for the above-specified items and determined that those items likely originated from cultures and/or archaeological sites within modern-

day Iran or Iraq. However, this assessment was provided with the stipulation that a final determination of the likely origin and authenticity of these items could not be made without a proper physical examination of each item.

31.     A search of the PREMISES and the seizure of the items identified in Attachment B would permit qualified experts to physically examine each item to determine and/or confirm the origin, authenticity, and, potentially, provenance and value of each item. Such physical examination—in conjunction with other investigative efforts and evidence, such as the documentation seized from the PREMISES—would thus provide important information to assist HSI in determining, among other things, whether the items: entered the United States by means of false or fraudulent invoices/statements; were imported in a manner that deprived the United States of any duties accruing on the items; were smuggled into the United States using false, forged, or fraudulent documents; were received, purchased, or sold after being imported contrary to law; were stolen or converted and transported or transferred in commerce; constitute Iraqi cultural property that was illegally removed from Iraq and traded or transferred; or are goods of Iranian origin that were unlawfully imported into the United States.

32.     Such physical examination would also provide important information to assist HSI in determining whether the items are subject to forfeiture under applicable statutes and potential repatriation to Iraqi authorities or to the Government of Iran (upon any future normalization of diplomatic relations).

33.     There is probable cause to believe that the items described in paragraph 29 of this affidavit and shown in the attached exhibits 2-64 were imported to the United States in violation of the laws and/or regulations described in the introductory section of

this affidavit. The items themselves may, therefore, be contraband, fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 542 (entry of goods by false statements); 18 U.S.C. § 545 (smuggling of goods into the U.S.); 18 U.S.C. § 371 (conspiracy); and specific violations of IEEPA (codified at Title 50, United States Code) and regulations issued pursuant to IEEPA, including 31 C.F.R., Part 576 (Iraq Stabilization and Insurgency Sanctions Regulations) and 31 C.F.R., Part 560 (Iranian Transaction and Sanctions Regulations).

## CONCLUSION

I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Dated at Portland, Maine this 26th day of April, 2024.

David C. Fife, Special Agent
Homeland Security Investigations

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Apr 26 2024

City and state:  Portland, Maine

Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

24